# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **MARIA ISABELLA DEL GADILLO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 11 C 7342** |
| | ) | **Judge Joan H. Lefkow** |
| **TOWN OF CICERO, GEORGE GREGORY,** | ) | |
| **MARK STEINHAGAN, TED KOLIN, JOHN** | ) | |
| **DOE, and JANE DOE,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Maria Isabella DelGadillo worked as an Assistant to the Fire Marshal in the Cicero Township Fire Department. She has filed an employment discrimination suit against the Town of Cicero, the Cicero Township Fire Marshal, two of her supervisors, and two unidentified Does alleging claims for race, national origin and gender discrimination in violation of 42 U.S.C. § 1983 (Count I), race and national origin discrimination in violation of 42 U.S.C. § 1981 (Count II), sexual harassment in violation of 42 U.S.C. § 1983 (Count III), conspiracy to interfere with civil rights in violation of 42 U.S.C. § 1985 (Count IV), and intentional infliction of emotional distress (Count V).[1] The two defendant supervisors, Mark Steinhagan and Ted Kolin, have filed a motion to dismiss the complaint pursuant to Rule 12(b)(6). For the following reasons, the motion [#40] will be denied.

---

[1] Subject matter jurisdiction over DelGadillo's federal civil rights claims is provided by 28 U.S.C. §§ 1331 and 1343(a)(3). This court has supplemental jurisdiction over the state law intentional infliction of emotional distress claim pursuant to 28 U.S.C. § 1367. Venue is proper under 28 U.S.C. § 1391(b) because the events that gave rise to DelGadillo's claims occurred in this district.

## BACKGROUND[2]

DelGadillo was hired by the Cicero Township Fire Department ("CFD") as the Assistant to the Fire Marshal in 2004. Kolin and Steinhagen were Assistant Fire Marshals who supervised DelGadillo. They are sued in their individual capacities.

The CFD Fire Marshal and Assistant Fire Marshals are authorized to create and implement policies regarding race, national origin, and gender-based discrimination within the CFD. They are also authorized to oversee and enforce matters regarding employee conduct and discipline. The Fire Marshal and Assistant Fire Marshals have final decision-making authority regarding workplace conduct issues within the CFD.

DelGadillo was the only Hispanic employee assigned to her office area and one of only four Hispanic employees in the CFD. DelGadillo was the only female assigned to her office area. Most of the CFD's employees were male.

Beginning in 2007, defendant George Gregory became the CFD Fire Marshal. Soon afterwards, he demoted DelGadillo from Assistant to the Fire Marshal to an administrative assistant position. He assigned a substantial amount of her job responsibilities to Michael Piekarski, a white male.

Gregory frequently used the word "nigger" to refer to African Americans and referred to Hispanics as "your people" in DelGadillo's presence. On one occasion, when DelGadillo noticed that Gregory had gotten a tan on a recent vacation, he told her, "[Y]eah, us white people tan red and you people get black almost like a nigger." Gregory fostered an environment in which

---

[2] The following facts are taken from DelGadillo's complaint and are presumed true for the purpose of resolving the pending motion.

numerous firemen and other co-workers openly referred to DelGadillo as "stupid" and a "rat." They also stated that she could not be trusted because she was a Hispanic woman.

In early 2010, DelGadillo heard firemen on the system radio reporting that they had narrowly avoided a collision with a Hispanic driver. The firemen used racial slurs when referring to the driver. When the firemen came back to the office, they told Gregory and Kolin about the incident and referred to Hispanic drivers as "stupid Mexican wetbacks that don't know how to drive." Gregory and Kolin laughed at the use of racial slurs, even though DelGadillo was present. When DelGadillo complained to Gregory and Kolin regarding the use of racial slurs at the CFD, they laughed at her and did not reprimand the firemen.

DelGadillo was subjected to racially discriminatory statements nearly every day. Gregory, Kolin and Steinhagen were aware of the discriminatory comments and participated in the banter. In June 2010, Kolin told DelGadillo that all she was "good for" was "making Mexican rice."

DelGadillo was also subjected to sexually discriminatory statements and harassment. The male firemen and co-workers made sexual comments to DelGadillo such as, "Your breasts are so perky, are you cold? I can see your nipples," "Are you putting on a sweater? I was just getting used to the nice view up here," "[A]re you wearing a thong today?" and "Can you bend over again?" Male employees often told DelGadillo that she "needed a stiff toss in bed." One Lieutenant at the CFD frequently came into the office, stuck his tongue out at DelGadillo, and told her, "Think of all the things I can do with this." He would also attempt to rub DelGadillo's shoulders. When DelGadillo took "Zumba" exercise classes, several CFD employees made comments to her about "her job working as a stripper" and spread rumors that she was a stripper.

Kolin told DelGadillo that "women are only good for making babies" after they attended a presentation that focused on abandoned children. In the summer of 2010, Piekarski brought a dirty, wet jacket into the office, threw it at DelGadillo, and told her to "wash the jacket and hang it up" because "that's all that women are good for."

Gregory overheard many of the comments that were directed at DelGadillo because his office was only ten feet from DelGadillo's desk. DelGadillo made it clear to Gregory that the comments made her uncomfortable and that she wanted the comments to stop. Gregory did not attempt to stop the comments and instead told DelGadillo, "It takes a special kind of person to work here. These guys don't have the best manners. Otherwise you're not going to work here long."

DelGadillo became increasingly upset as the racist and sexist comments and behavior persisted in 2010. She was particularly offended by Steinhagen's conduct. Steinhagen frequently referred to all Hispanic women as "whores" and told DelGadillo that someone could "make a whore scream by not paying her." He showed pictures from lingerie magazines to DelGadillo and suggested that she purchase and wear certain items that would look good on her. Steinhagen told DelGadillo that she should have more sex because it help her skin "clear up."

Steinhagen also touched DelGadillo's shoulders and legs on several occasions, saying he was "just brushing some lint off." In early 2010, Steinhagen began to touch and fondle DelGadillo's buttocks. When DelGadillo attempted to avoid Steinhagen's physical advances, he said, "You must be on your period today, I can smell it." In the summer of 2010, Steinhagen forcibly kissed DelGadillo on the lips.

4

DelGadillo repeatedly told her supervisors, including Gregory and Kolin, that she did not like how she was treated by Steinhagan and other employees of the CFD. Kolin told DelGadillo not to report any conduct to Internal Affairs and that he "would take care of it." He said, "Swear to me that you won't tell Internal Affairs because we have it good over here."

Shortly after this conversation, Kolin began to make sexual comments to DelGadillo. He told DelGadillo that her lipstick looked good and said, "I wish it was on me." Kolin also told DelGadillo that she should grow her hair longer because he was attracted to longer-haired women. Several times, Kolin told DelGadillo that she "needed a man" and a "stiff drink" because she was single and "always alone." On one occasion, Kolin told DelGadillo to meet him in his office and to wear "tight jeans." Kolin asked DelGadillo to give him advance warning before she came to his office so he could be "nice and fresh" for her. When DelGadillo refused Kolin's advances, he would remark that she must be in a bad mood because she was menstruating.

Eventually, in retaliation for attempting to report harassment and refusing his advances, Kolin prevented DelGadillo from taking her full lunch breaks. DelGadillo told Kolin that she was entitled to take full meal breaks, and he responded that she was "talking back." Kolin then threatened to take away her lunch breaks completely. He yelled, "Who the fuck do you think you are?" and began taking off his belt. DelGadillo ran out of the room because she felt physically threatened and thought that Kolin was going to whip her with his belt. Kolin later approached DelGadillo and told her that only a "rat" would report workplace conduct to Internal Affairs. Kolin told DelGadillo, "You know what happens to rats, they drown and die."

In the summer of 2010, DelGadillo complained about the sexist and racist behavior to the Town of Cicero's Internal Affairs Department. She told an Internal Affairs representative that

she feared for her life because she was making complaints of race and sex-based discrimination and harassment. After DelGadillo made the complaint, she noticed that Kolin and Gregory began to shred a large number of documents.

CFD employees were eventually required to attend a presentation on sexual harassment. During and after the presentation, male employees made fun of the scenarios that were presented as examples of sexual harassment. They also made disparaging remarks to DelGadillo about how she was going to complain about them. DelGadillo told Gregory and other supervisors that no one had taken the sexual harassment presentation seriously. The sexual harassment and race discrimination continued after DelGadillo complained to Internal Affairs.

Indeed, Kolin and Steinhagan began to indicate their displeasure with DelGadillo's decision to complain. Kolin told DelGadillo that she might fit it more if she was "one of the guys." Steinhagan called DelGadillo a "feisty bitch" after she asked a follow-up question regarding instructions he had given her for a workplace task. As a result, DelGadillo panicked and became overwhelmed by anxiety. She worried that she would continually be subjected to Steinhagan's unwanted sexual comments and touching. DelGadillo sent suicidal text-messages to Lieutenant Mike Vilumis, who called the paramedics. DelGadillo was taken to McNeil Hospital, where she received treatment for severe emotional distress. She subsequently sought therapy and other follow-up treatment.

Gregory, Kolin, and Steinhagan have caused DelGadillo to feel ashamed and "stupid" for allowing herself to be demeaned in the workplace. Gregory has attempted to intimidate DelGadillo and prevent her from initiating this lawsuit. Gregory's daughter called DelGadillo on the phone and attempted to prevent DelGadillo from filing suit. On October 17, 2011, Gregory or

his agent delivered a note to DelGadillo that threatened DelGadillo and her daughter. As a result

of these experiences, DelGadillo has experienced physical illness, sleeplessness, nausea, skin

breakouts, and her hair has begun to thin. DelGadillo has also had to miss work and use vacation

and sick days because of the stress.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges a complaint for failure to state a

claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6); *Gen. Elec. Capital Corp.*

v. *Lease Resolution Corp.,* 128 F.3d 1074, 1080 (7th Cir. 1997). In ruling on a 12(b)(6) motion,

the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all

reasonable inferences from those facts in the plaintiff's favor. *Dixon* v. *Page,* 291 F.3d 485, 486

(7th Cir. 2002). In order to survive a Rule 12(b)(6) motion, the complaint must not only provide

the defendant with fair notice of the claim's basis, but must also establish that the requested relief

is plausible on its face. *Ashcroft* v. *Iqbal,* 556 U.S. 662 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d

868 (2009); *see also Bell Atl.* v. *Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929

(2007). At the same time, the plaintiff need not plead legal theories. *Hatmaker* v. *Mem'l Med.*

*Ctr.,* 619 F.3d 741, 743 (7th Cir. 2010). Rather, it is the facts that count.

## ANALYSIS

Steinhagan and Kolin's motion to dismiss and reply memorandum are far from models of

clarity. As well as the court can discern, Steinhagan and Kolin argue that (1) DelGadillo's

intentional infliction of emotional distress ("IIED") claim must be dismissed as barred by the

Illinois Human Rights Act ("IHRA"), (2) in the alternative, her IIED claim must be dismissed as

barred by the Illinois Workmen's Compensation Act ("IWCA"),[3] (3) DelGadillo's section 1983

claim must be dismissed because she has failed to state that Steinhagan and Kolin were acting

under color of state law, and (4) DelGadillo's federal civil rights claims must be dismissed

because she did not exhaust her administrative remedies with the Equal Employment Opportunity

Commission ("EEOC").[4]

In addition, Steinhagan and Kolin repeatedly assert that DelGadillo's complaint must be

dismissed because she failed to submit evidence in support of her claims and has misrepresented

the facts. Such issues are not under consideration when the court is ruling on a Rule 12(b)(6)

motion to dismiss, as the court must accept all of the allegations in the complaint as true. *See*

*Dixon*, 291 F.3d at 486. To the extent Steinhagan and Kolin attempt to call the factual basis for

DelGadillo's claims into question, or contradict the allegations in DelGadillo's complaint with

their own unsupported assertions of fact, their arguments have been disregarded.

**I.      Whether DelGadillo's IIED Claim is Barred by the IHRA**

The IHRA gives the Illinois Human Rights Commission exclusive jurisdiction over civil

rights violations covered by the Act. *See* 775 Ill. Comp. Stat. 5/8-111(D). Federal district courts

sitting in Illinois, like Illinois state courts, lack jurisdiction to consider claims for civil rights

violations within the meaning of the IHRA. *See Krocka* v. *City of Chicago*, 203 F.3d 507,

---

[3] Steinhagan and Kolin also argue that DelGadillo's claim for negligent infliction of emotional distress must be dismissed as preempted by the IHRA and IWCA. DelGadillo has not asserted a claim for negligent infliction of emotional distress. This argument – which is repeated numerous times – has been disregarded.

[4] Steinhagan and Kolin raised this issue for the first time in their reply memorandum. DelGadillo filed a motion to strike the new argument, which the court denied but considered the arguments therein in lieu of a surreply. *See* Dkt. #49.

516–17 (7th Cir. 2000) (citing *Geise* v. *Phoenix Co. of Chicago, Inc.*, 639 N.E.2d 1273, 159 Ill. 2d 507, 203 Ill. Dec. 454 (1994)).

Whether a tort claim is barred by the IHRA depends on whether it is "inextricably linked to a civil rights violation such that there is no independent basis apart from the Act itself." *Maksimovic* v. *Tsogalis*, 687 N.E.2d 21, 23, 177 Ill. 2d 511, 227 Ill. Dec. 98 (1997); *accord Blount* v. *Stroud*, 904 N.E.2d 1, 8, 232 Ill. 2d 302, 328 Ill. Dec. 239 (2009). A tort claim is "inextricably linked" to a civil rights violation prohibited by the IHRA if "the Act furnished the legal duty that the defendant was alleged to have breached." *Maksimovic*, 687 N.E.2d at 23. The fact that a tort claim is "related" to a civil rights violation or is predicated on the same factual allegations that support the plaintiff's discrimination claim does not mean that it is preempted. *See id.* at 23–24; *Naeem* v. *McKesson Drug Co.*, 444 F.3d 593, 604 (7th Cir. 2006). Rather, the court must look to the allegations in the complaint to determine whether a plaintiff has alleged the elements of a tort claim without reference to the legal duties created by the IHRA. *See Blount*, 904 N.E.2d at 8–9; *Bannon* v. *Univ. of Chicago*, 503 F.3d 623, 630 (7th Cir. 2007); *Naeem*, 444 F.3d at 604; *Maksimovic*, 687 N.E.2d at 23.

In order to state a claim for IIED, DelGadillo must allege (1) that defendants engaged in extreme and outrageous conduct, (2) that they had the intent to cause, or a reckless disregard of the probability of causing, emotional distress, and (3) that their conduct, in fact, caused severe emotional distress. *See, e.g.*, *Reilly* v. *Wyeth*, 876 N.E.2d 740, 755, 377 Ill. App. 3d 20, 315 Ill. Dec. 428 (2007). The allegations in DelGadillo's complaint clearly establish a claim for IIED without reference to a legal duty furnished by the IHRA. Defendants' physical and verbal harassment would have offended a reasonable person even if it were not racially and sexually

9

discriminatory. In addition, Kolin physically threatened DelGadillo on at least one occasion. Then, after DelGadillo complained to the Internal Affairs Department, Steinhagan and Kolin indicated that they were not going to stop the conduct and Steinhagan called DelGadillo a "feisty bitch." Defendants also made DelGadillo feel ashamed for having complained outside her department and attempted to prevent her from filing a discrimination suit. Under these circumstances, defendants' conduct could be considered sufficiently intimidating and threatening irrespective of whether they had a discriminatory motivation. Because a reasonable jury could conclude that DelGadillo has established the elements of an IIED claim even if she is unable to prove that the conduct was because of her sex or race, DelGadillo's IIED claim will not be dismissed as preempted by the IHRA.

## II.      Whether DelGadillo's IIED Claim is Preempted by the IWCA

The IWCA provides the exclusive remedy for claims against an employer for accidental injuries in the workplace. *See Meerbrey* v. *Marshall Field & Co.,* 564 N.E.2d 1222, 1225, 139 Ill. 2d 455, 151 Ill. Dec. 560 (1990). The IWCA's exclusive remedy provisions do not, however, bar employees from pursuing tort claims against a co-employee for injuries arising out of the co-employee's intentional torts. *Id.* at 1231. The rationale is that "[t]he socially beneficial purpose of the workmen's compensation law was not meant to permit a person who commits an intentional tort to use the compensation law as a shield against liability." *Id.* at 1230 (quoting *Jablonski* v. *Multack*, 380 N.E.2d 924, 928, 63 Ill. App. 3d 908, 20 Ill. Dec. 715 (1978)). Therefore DelGadillo is not barred from bringing IIED claims against Steinhagan or Kolin, both of whom are alleged to have committed intentional torts against her. *See id.*; *Richardson* v. *Cnty. of Cook*, 621 N.E.2d 114, 118–19, 250 Ill. App. 3d 544, 190 Ill. Dec. 245 (1993) (reversing grant

of summary judgment in favor of co-employees who committed intentional torts); *O'Connell* v. *Cont'l Ekec. Constr. Co.*, No. 11 C 2291, 2011 WL 4916464, at *6 (N.D. Ill. Oct. 17, 2011) (denying motion to dismiss IIED claim against supervisor as preempted by IWCA).[5]

## III. Whether Steinhagen and Kolin Acted Under Color of State Law

Steinhagen and Kolin assert generally that DelGadillo's "constitutional" claims must be dismissed, but their skeletal argument is difficult to follow.  They first state that DelGadillo's "U.S. Constitutional claims including but not limited to the Fourteenth Amendment" must be dismissed because the complaint "fails to allege any facts that Defendants Kolin and Steinhagen were involved with the State in any action giving rise to her . . . claims."  (Mem. at 5.)  They then assert that a Fourteenth Amendment claim "may be brought against a private actor only if the private actor is sufficiently entangled with the State so that his or her conduct is fairly attributable to the State."  (Mem. at 5 (citing *Collins* v. *Womencare*, 878 F.2d 1145 (9th Cir. 1989)).  Steinhagen and Kolin do not specify which of DelGadillo's federal civil rights claims, which are brought under sections 1981, 1983, and 1985, must be dismissed on this basis.  Since section 1981 and section 1985 can provide a remedy for damages caused by purely private actors, *see* 42 U.S.C. § 1981(c); *Griffin* v. *Breckenridge*, 403 U.S. 88, 101-02, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971) (discussing section 1985), by process of elimination the court assumes that they are targeting DelGadillo's section 1983 claim.

To state a claim under section 1983, a plaintiff must allege (1) the violation of a constitutional right, and (2) that the alleged deprivation was committed by a person "acting under

---

[5] DelGadillo's IIED claim is asserted only against the individual defendants.  Therefore the court need not consider whether any claim against the Town of Cicero would be preempted.

11

color of law." *West* v. *Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988). An

action taken by a state employee is considered as occurring "under color" of state law "when it

involves a misuse of power, possessed by virtue of state law and made possible only because the

wrongdoer is clothed with the authority of state law." *Wilson* v. *Price*, 624 F.3d 389, 392 (7th

Cir. 2010) (quoting *Honaker* v. *Smith*, 256 F.3d 477, 484-85 (7th Cir. 2001)). "[A]cts by a state

officer are not made under color of state law unless they are related in some way to the

performance of the duties of the state office." *Valentine* v. *City of Chicago*, 452 F.3d 670,

682–83 (7th Cir. 2006) (quoting *Honaker,* 256 F.3d at 484–85).[6]

To the extent that Steinhagan and Kolin intend to suggest that the Town of Cicero is a

"private" employer, their argument is without merit. DelGadillo's allegations, if proven, would

establish that Steinhagan and Kolin, two employees of a state entity, used their positions as

DelGadillo's supervisors to harass DelGadillo and to prevent her from complaining about their

conduct. The allegations also show that the Town of Cicero gave Assistant Fire Marshals the

authority to create and implement a sex and race discrimination policy and to discipline

employees for workplace misconduct. Finally, all of the alleged discriminatory conduct took

place at work and while Steinhagan and Kolin were acting in their supervisory capacities.

Drawing all inferences in DelGadillo's favor, the complaint is sufficient to support the inference

---

[6] The Supreme Court has made clear that if a defendant's conduct satisfies the state action requirement of the Fourteenth Amendment, the conduct is also considered to be under color of state law for the purposes of a section 1983 claim. *West*, 487 U.S. at 49. "To constitute state action, 'the deprivation must be caused by the exercise of some right or privilege crated by the state . . . or by a person for whom the state is responsible,' and 'the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.* (quoting *Lugar* v. *Edmondson Oil Co., Inc.*, 457 U.S. 922, 936, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982)). A person employed by the state is generally considered a state actor. *Id.* Thus, in this case, the "state action" requirement is virtually identical to section 1983's "under color of law" requirement. *See id.* (noting that a public employee generally acts under color of state law if he is exercising his responsibilities pursuant to state law).

that Steinhagen and Kolin were acting under color of state law. *See Valentine*, 452 F.3d at 683 (reversing grant of summary judgment where Chicago Department of Transportation employees were exercising their supervisory authority when they participated in plaintiff's harassment); *McDonough* v. *City of Chicago*, 743 F. Supp. 2d 961, 978 (N.D. Ill. 2010) (denying motion for summary judgment because a reasonable jury could conclude that harassment related directly to defendant's responsibilities as supervisor). Steinhagen and Kolin's motion to dismiss DelGadillo's section 1983 claim will be denied.

## IV.    Exhaustion of Administrative Remedies

Finally, Steinhagen and Kolin argue that DelGadillo's complaint must be dismissed because she did not exhaust her administrative remedies by filing a charge of discrimination with the EEOC. They have overlooked the fact that DelGadillo does not assert claims under Title VII of the Civil Rights Act of 1964. DelGadillo was not required to exhaust administrative remedies before filing claims under section 1981, 1983, or 1985 in federal court. *See, e.g.*, *Patsy* v. *Bd. of Regents of State of Fla.*, 457 U.S. 496, 516, 102 S. Ct. 2557, 73 L. Ed. 2d 172 (1982) (section 1983)*; Johnson* v. *Ry. Express Agency, Inc.*, 421 U.S. 454, 460–61, 95 S. Ct. 1716, 44 L. Ed. 2d 295 (1975) (section 1981)*; Wudtke* v. *Davel*, 128 F.3d 1057, 1063 (7th Cir. 1997) (section 1983); *Washington* v. *U.S. Postal Serv.*, No. 87 C 5782, 1990 WL 36239 at *3 (N.D. Ill. Mar. 6, 1990) (section 1985). Nor was she required to exhaust any administrative remedies before bringing a state law IIED claim. Therefore DelGadillo's complaint will not be dismissed for failure to exhaust administrative remedies.

## CONCLUSION AND ORDER

Steinhagen and Kolin's motion to dismiss [#40] is denied. Steinhagen and Kolin are directed to answer the complaint by September 24, 2012. This case is set for a status hearing on September 27, 2012 at 8:30 a.m.

Dated: September 10, 2012                    Enter: _____
                                                    JOAN HUMPHREY LEFKOW
                                                    United States District Judge

14