# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **MARIA ISABELLA DELGADILLO,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **No. 11 C 7342** |
| ) | |
| ) | **Hon. Joan H. Lefkow** |
| **TOWN OF CICERO, GEORGE GREGORY,** ) | |
| **MARK STEINHAGAN, TED KOLIN, JOHN** ) | |
| **DOE, and JANE DOE,** ) | |
| ) | |
| **Defendants.** ) | |

## OPINION AND ORDER

On October 17, 2011, Maria Isabella DelGadillo filed suit against George Gregory, Mark

Steinhagan, Ted Kolin, two unknown defendants, and the Town of Cicero alleging violations of

her civil rights protected by 42 U.S.C. §§ 1983, 1981, and 1985, as well as intentional infliction

of emotional distress under Illinois common law. (Dkt. 1.) Defendants have moved for

summary judgment. (Dkt. 137.)[1] For the reasons stated below, defendants' motion is granted in

part and denied in part.[2]

---

[1] The court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367. Venue is appropriate
under 28 U.S.C. § 1391(b).

[2] Defendants also bring a motion to strike plaintiff's affidavit because it contains hearsay,
improper conclusions and "considerable evidence" that defendants argue plaintiff failed to disclose. (Dkt.
178 at 2–3.) For the purposes of the present motion for summary judgment, however, the court only
relied on evidence presented in accordance with the applicable federal and local rules. Thus, defendants'
motion to strike is denied as moot.

# BACKGROUND[3]

## I. The Parties

DelGadillo is a Hispanic woman of Mexican descent. (Dkt. 162 ("Pl. L.R. 56.1") ¶ 1.) In January of 2005, the Town of Cicero ("the Town") hired her to work at its Fire Department's headquarters. (*Id.* ¶ 2.) DelGadillo claims her title was "administrative assistant" (*id.*); defendants claim it was "clerk" (dkt. 139 ("Def. L.R. 56.1") ¶ 1).

For the period of time relevant to the present motion, Gregory served as the Fire Department's Fire Marshal; Steinhagan[4] and Kolin served as Assistant Fire Marshals. (Pl. L.R. 56.1 ¶ 3.) DelGadillo asserts that all three were her supervisors. (*Id.*) Defendants insist that only Gregory was her supervisor. (Dkt. 180 ("Def. L.R. 56.1 Resp.") ¶ 3.)

Gregory, Steinhagan, and Kolin are Caucasian men. (Pl. L.R. 56.1 ¶ 3.) According to DelGadillo, she was the only woman at the Fire Department when she was hired in 2005; one other woman was hired in 2007. (*Id.* ¶¶ 6–7.)

## II. DelGadillo's Duties

DelGadillo sat at a desk in the front of the building. (*Id.* ¶ 4.) She answered phones and greeted people when they came in. (*Id.*) She performed typical administrative duties, including tracking the firemen's attendance, scheduling meetings, arranging training sessions, and filling

---

[3] The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (citing *Fresenius USA, Inc.* v. *Baxter Int'l Inc.*, 582 F.3d 1288, 1303 (Fed. Cir. 2009)). In accordance with its regular practice, the court has considered the parties' objections to statements of fact and included in this background only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion.

[4] It is unclear whether Steinhagan's name is spelled with an "an" or an "en" as both spellings appear in the parties' briefs, including those submitted by Steinhagan's attorney. (*See, e.g.*, dkt. 149.)

out and filing reports. (*Id.* ¶ 5.) She also assisted the firemen with various clerical tasks when needed. (*Id.*)

There were two cabinets placed on either side of DelGadillo's desk, so that her chair could only be reached by walking through the narrow corridor created by the cabinets. (*Id.* ¶ 4.)

## III.    Discrimination and Harassment

When DelGadillo was first hired, Jerry Chalda was the Fire Marshal. (*Id.* ¶ 9.) According to DelGadillo, Chalda kept the firemen from harassing her. (*Id.* ¶ 10.) Chalda left in 2007, however, and Gregory was promoted to fill his place. (*Id.* ¶ 11.) DelGadillo asserts that once Gregory was Fire Marshal, she was subjected to constant discrimination and harassment. (*Id.* ¶ 12.) DelGadillo's allegations are detailed below.

### A.    Allegations Against Kolin

DelGadillo states that Kolin frequently made sexual remarks to her. (*Id.* ¶ 28.) For example, after telling her that her lipstick looked good, he said, "I wish it was on me." (*Id.* ¶ 29.) He also asked DelGadillo to wear tight jeans and grow her hair long because he was attracted to women with long hair. (*Id.*) On more than one occasion he told DelGadillo that all she needed was a "stiff man and a stiff drink." (*Id.* ¶ 28.)

Kolin also propositioned DelGadillo—asking her to get dinner and drinks and to "meet him upstairs" in the firehouse that was attached to headquarters. (*Id.* ¶ 32.) When DelGadillo rebuffed his advances, Kolin told her that she must be in a bad mood because she was menstruating. (*Id.* ¶ 33.) He also started preventing her from taking full lunch breaks in retaliation. (*Id.*) When DelGadillo grew frustrated and told Kolin that she was entitled to take full lunch breaks, he said she was "talking back" and threatened to take away her lunch breaks completely. (*Id.* ¶ 34.) According to DelGadillo, he then yelled, "Who the fuck do you think

you are?" and started taking off his belt.  (*Id.*)  DelGadillo ran out of the room because she was

afraid Kolin was going to whip her.  (*Id.*)

Kolin also made disparaging remarks about women:  after a workplace presentation on

abandoned infants, Kolin told DelGadillo that all women are good for is "making babies."  (*Id.*

¶ 30.)  According to DelGadillo, he made racist remarks as well.  After she brought Mexican-

style rice to work, Kolin told her "make some of your Mexican rice.  That's all you're good for."

(*Id.* ¶ 31.)

### B.      Allegations Against Steinhagen

Steinhagen, like Kolin, was also an Assistant Fire Marshal.  (*Id.* ¶ 36.)  According to

DelGadillo, once Steinhagen was assigned to headquarters, the frequency and severity of Kolin's

harassment increased.  (*Id.* ¶ 37.)  On one occasion, Steinhagen and Kolin brought Popeye's

chicken to the office.  (*Id.* ¶ 46.)  After offering DelGadillo a piece, both men asked, "[W]ell,

now that we've bought you dinner, what else is after dinner?  Maybe sex?"  (*Id.*)

DelGadillo describes Steinhagen's harassment and humiliation of her as constant.  (*Id.*

¶ 38.)  Steinhagen frequently sat in DelGadillo's chair before she arrived at work.  (*Id.* ¶ 51.)  He

would not get up until DelGadillo approached him, forcing her to pass him in the narrow corridor

created by the cabinets behind the desk.  (*Id.*)  When they passed, Steinhagen would make a

point of brushing up against her.  (*Id.*)  Steinhagen would also stand in the hallway when she got

up to use the bathroom, again brushing up against her as she passed.  (*Id.* ¶ 50.)  He would touch

and "grope her" when she returned.  (*Id.*)  He would also humiliate her:  DelGadillo states that

when she got up from her chair, Steinhagen would say "oh, you must be on your period today

because it smells like fish."  (*Id.* ¶ 38.)

According to DelGadillo, Steinhagan would frequently find excuses to touch her, like saying he was taking pieces of lint off her thigh and back. (*Id.* ¶ 49.) He would also come up behind her and rub his body against hers. (*Id.* ¶ 48.) Once, Steinhagan forcibly kissed her on the lips. (*Id.* ¶ 47.)

In addition, Steinhagan frequently told DelGadillo jokes about women. (*Id.* ¶ 42.) One such joke was "do you know why a whore screams[?] . . . because you don't pay her." (*See* dkt. 1 ("Compl.") ¶ 57.) He also referred to Hispanic women as whores. (Pl. L.R. 56.1 ¶ 42.)

DelGadillo states that Steinhagan left printouts of these jokes on her desk. (*Id.* ¶ 39.) He also left pornographic and lingerie magazines. (*Id.* ¶ 40.) On more than once occasion, Steinhagan approached DelGadillo with picture of "provocative lingerie" and told her that it would look nice on her. (*Id.*) Steinhagan also told her she should have more sex because it would help her skin clear up. (*Id.* ¶ 43.)

### C. Allegations Against Piekarski

DelGadillo also claims that Michael Piekarski harassed her, although he is not one of the named defendants. Piekarski is a retired Fire Deputy who was later hired as a civilian assistant to the Fire Marshal. (*Id.* ¶ 7.) His wife, Olivia Piekarski, was hired as an Emergency Response Coordinator (she was the only other woman working at the Fire Department when DelGadillo was allegedly harassed).[5] (*Id.* ¶¶ 6–7.) According to DelGadillo, Michael Piekarski yelled at her and degraded her. (*Id.* ¶ 15.) DelGadillo testified that on two or three occasions, he screamed at her at the top of his lungs that women did not belong in the Fire Department and that they should be "at home ironing and taking care of kids." (*Id.*) On another occasion, Piekarski threw a dirty

---

[5] Olivia was not married to Michael Piekarski when she was hired. (Dkt. 178 at 5.)

jacket on her desk and told her to take care of it, because that is "all women are good for." (*Id.*) Piekarski also routinely called her stupid and asked her whether all Mexicans were stupid. (*Id.*)

### D. Allegations Against the Town's Firefighters

DelGadillo also makes allegations against the Town's firefighters generally. For example, she states that when she started taking Zumba dance classes—a form of exercise—the firefighters spread rumors that she was working as a stripper.[6] (*Id.* ¶ 18.) She also states that they asked her to bend over, asked her whether she was wearing a thong, and complained when she put on a sweater, commenting "I was just getting used to the nice view up here." (*Id.* ¶ 20.) According to DelGadillo, the firefighters also routinely told her that she needed "a stiff toss in bed" and that her breasts were perky and they could see her nipples. (*Id.* ¶ 19.) DelGadillo also claims that the firefighters, including Kolin and Steinhagan, frequently referred to her as "stupid, an idiot, [and] a dumb Mexican." (*Id.* ¶ 23.) The firefighters also physically harassed her. For example, DelGadillo testified in her deposition that Lieutenant Richard Moravecek[7] touched her and tried to lick the back of her neck. (*Id.* ¶ 14.)

### E. Allegations Against Gregory

DelGadillo alleges that Gregory knew about the firefighters' harassment of her and did nothing to stop it. Specifically, she claims that she told Gregory about Kolin, Steinhagan, and Piekarski's behavior and that he told her to stop complaining. (*Id.* ¶¶ 55, 16.) Indeed, DelGadillo testified that she complained about Piekarski twice and that Gregory told her to "shut up" because he "didn't want to hear about it." (*Id.* ¶ 16.) DelGadillo asserts that Gregory made

---

[6] According to DelGadillo, Steinhagan was one of these firefighters. (Pl. L.R. 56.1 ¶ 43.) He referred to her Zumba classes as "stripper classes" and told DelGadillo she had to "learn those stripper moves." (*Id.*)

[7] Defendants refer to him as Richard Moravech. (*See, e.g.*, dkt. 179 at 8.)

other dismissive statements as well, such as "if you don't like it here, maybe you should go somewhere else because in order for you to work here, you have to be a certain kind of person" and "I don't want to hear. I don't want to know. The less I hear the -- the more I don't know the less I get involved." (*Id.* ¶¶ 55–56.)

Although DelGadillo does not allege that Gregory sexually harassed her, she does allege that he made racists remarks to her. According to DelGadillo, Gregory used racial slurs in her presence, including the word "nigger." (*Id.* ¶ 25.) He also referred to Hispanics as "your people" when addressing DelGadillo. (*Id.*) On one occasion, when Gregory returned from vacation, DelGadillo remarked that he was tan. (*Id.* ¶ 26.) Gregory responded "yeah, us white people tan red and you people get black almost like a nigger." (*Id.*)

DelGadillo also contends that Gregory condoned racial slurs in her presence. According to DelGadillo, one day in early 2010, several off-duty firefighters narrowly avoided a collision with a Hispanic driver. (*Id.* ¶ 24.) After getting out of their vehicle, the firefighters used racial slurs for Hispanics, which DelGadillo heard over the Fire Department's radio. (*Id.*) When the firefighters returned to headquarters, they told Gregory and Kolin that all Hispanic drivers are "stupid Mexican wetbacks that don't know how to drive." (*Id.*) According to DelGadillo, Gregory and Kolin laughed at the slur both over the radio and in the office. (*Id.*) Gregory did not reprimand the firefighters. (*Id.*)

## IV.    Investigation and Response

DelGadillo reported the harassment to Internal Affairs in February 2010. (*See id.* ¶¶ 58–59; dkt. 139-24 at 2.) The harassment was then investigated by the Inspector General, James Klosak. (*See* Pl. L.R. 56.1 ¶ 59.) According to Klosak's notes, DelGadillo complained that unnamed firefighters greeted her with "Hi Stupid" and "Hi Idiot," kissed her, asked her to put on

a swimsuit and fire boots and model them, and told her that if they had a baby they would "certainly have enough milk."  (Dkt. 139-24 at 2.)  Klosak's notes also state that DelGadillo exhibited a "reluctance to come forward" and a "fear of retaliation."  (*Id.*)

Three weeks later, Klosak conducted several formal interviews with DelGadillo that she asserts made her fear for her job.  (Pl. L.R. 56.1 ¶ 62.)  One of these interviews involved two third parties—a commander from the Police Department and a Town employee.  (*Id.* ¶ 63.)  During the interview, DelGadillo recanted her previous allegations.  She stated that no one was harassing her—that the firefighters were "all talk like that" and it did not bother her.  (Dkt. 139-18 at 11:12–12:5.)  In her response to defendants' motion for summary judgment, however, DelGadillo explains that this recantation was out of fear.  (Dkt. 163 at 15–16.)  Klosak's notes dated a month after this interview again include observations of "a reluctance to come forward with detailed allegations" and "a fear of retaliation."  (Dkt. 139-24 at 2.)

Klosak told Kolin about DelGadillo's allegations in May 2010.  (Pl. L.R. 56.1 ¶ 74.)  Shortly thereafter, the harassment escalated—DelGadillo was threatened and Kolin called her a rat and told her that rats get killed.  (*Id.*)  That same month, the Town ordered the firefighters to attend a sexual harassment training session.  (*Id.* ¶ 78.)  According to DelGadillo, none of the firefighters took the training session seriously.  (*Id.* ¶¶ 78, 84.)

## V.    Nervous Breakdown and Aftermath

On October 7, 2010, DelGadillo had a "nervous breakdown."  (*Id.* ¶¶ 86–87, 90.)  According to DelGadillo, she had suggested, over the phone, that Steinhagen reschedule an appointment.  (*Id.* ¶ 87.)  In response, Steinhagen called her a "feisty bitch" and said, "You don't tell me what to do.  I tell you what to do.  Who the hell do you think you are?  . . . wait until I get back there.  I'm going to get you."  (*Id.* ¶ 88.)  DelGadillo testified that she thought he was going

to hurt her: "I couldn't comprehend. I thought he was going to come back and beat me, rape me, kill me." (*Id.*) DelGadillo broke down and was taken to the emergency room in an ambulance. (*Id.* ¶ 90.) DelGadillo went back to work a few days later. (*Id.* ¶ 93.) She states that when she did, the first thing she saw was Steinhagan sitting at her desk and she "broke down again."[8] (*Id.*) DelGadillo was placed on medical leave. (*Id.*) Later that month, Steinhagan and Kolin were transferred. (*Id.* ¶ 77.)

Shortly after her breakdown, a note was left at DelGadillo's house that read

> LISTEN YOU CRAZY MEXICAN BITCH YOU BETTER WITHDRAW ALL CHARGES AGENST [sic] THE FIRE DEPARTMENT CHIEF'S [sic] OR YOU AND YOUR DAUGHTER WILL REGRET IT!!

(*Id.* ¶ 95.) DelGadillo also received calls from Gregory's adult daughter, Angela Gregory, telling her not to make allegations against Gregory and other firefighters. (*Id.* ¶ 94.) Since being placed on medical leave, DelGadillo has seen two mental health professionals, both of whom diagnosed her with post-traumatic stress disorder and depression. (*Id.* ¶¶ 97–98.)

DelGadillo filed suit in federal court on October 17, 2011. (*See* Compl.) Because DelGadillo failed to file a complaint with the Equal Employment Opportunity Commission, she waived her right to sue her employer, the Town, under Title VII. Her complaint alleges violations of 42 U.S.C. §§ 1983, 1981, and 1985 as well as intentional infliction of emotional distress. (*See id.*) In February 2014, DelGadillo received a letter from the Town placing her

---

[8] A report from Internal Affairs states that on October 12, 2010, also few days after her nervous breakdown, DelGadillo handed the executive assistant to the Inspector General a magazine that Steinhagan had given her. DelGadillo told the assistant that Steinhagan had touched her thigh and then had gone through the magazine with her, asking her how she liked the outfits. (Dkt. 162-2 at 2.) The report states that DelGadillo was not sure if Steinhagan was "hitting on her" or "just trying to be nice" but that she was afraid "of retaliation." (*Id.*)

with the Police Department. (Pl. L.R. 56.1 ¶ 102.) Her health counselors, however, advised her not to work in an "all-male environment." (*Id.*) The Town terminated DelGadillo's medical leave in March 2014 and she has not been paid since. (*Id.*) In May 2014, defendants moved for summary judgment on all counts.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011).

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is

factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24.

## ANALYSIS

DelGadillo's complaint is composed of five counts: (1) race, national origin, and gender discrimination in violation of the Equal Protection Clause under § 1983; (2) race and national origin discrimination in violation of § 1981; (3) sexual harassment in violation of § 1983; (4) conspiracy to interfere with civil rights in violation of § 1985; and (5) intentional infliction of emotional distress. (*See* Compl.) The legal theory underlying some of the counts is confused.

As the court understands them, DelGadillo's claims are as follows: (1) race, national origin, and gender discrimination in violation of the Equal Protection Clause under § 1983; (2) race and national origin discrimination in violation of § 1981 under § 1983[9]; (3) hostile work environment based on sexual and racial harassment in violation of the Equal Protection Clause under § 1983[10]; (4) conspiracy to interfere with civil rights in violation of § 1985; and (5) intentional infliction of emotional distress.

---

[9] DelGadillo's second count must be brought pursuant to § 1983, as § 1981 does not create a private right of action against state actors. *See Campbell* v. *Forest Pres. Dist. of Cook Cnty., Ill.*, 752 F.3d 665, 671 (7th Cir. 2014) *cert. denied sub nom. Campbell* v. *Forest Pres. Dist. of Cook Cnty., Ill.*, 135 S. Ct. 947 (2015) (holding that "§ 1983 remains the exclusive remedy for violations of § 1981 committed by state actors").

[10] DelGadillo alleges that she was subjected to a hostile work environment under counts 1, 2, and 3. (Pl. L.R. 56.1 ¶¶ 128, 145, 150.) DelGadillo's third count—that she suffered sexual harassment in violation of the Equal Protection Clause—functions like a hostile work environment claim under Title VII, except it has an additional intent requirement. *See Figueroa* v. *City of Chi.*, No. 97 C 8861, 2000 WL 1036017, at *1 (N.D. Ill. July 20, 2000) (citing *Trautvetter* v. *Quick*, 916 F.2d 1140, 1149 (7th Cir. 1990)). Thus, DelGadillo's allegation that she was subjected to a hostile work environment under count 3 is likely intended to explain that count—not to assert a separate claim. Counts 1 and 2, however, pertain to racial discrimination. Because DelGadillo's complaint does not already include a hostile work environment claim based on race, the court will assume that DelGadillo intended her allegations of racial discrimination to be included in her hostile work environment claim.

DelGadillo alleges the first four counts against all defendants; the fifth is alleged against the individual defendants only. Thus, for each count, DelGadillo must establish the liability of each defendant.

## I.  *Monell* Liability

Because a municipality is only responsible for "[its] *own* illegal acts," a § 1983 plaintiff must demonstrate that the entity acted pursuant to a policy or custom. *Connick* v. *Thompson*, --- U.S. ---, 131 S. Ct. 1350, 1359–60, 179 L. Ed. 2d 417 (2011) (emphasis in original) (internal citation omitted); *Monell* v. *Department of Social Services*, 436 U.S. 658, 665–83, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). A plaintiff may establish an official policy or custom by showing (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well-settled as to constitute a "custom or usage" with the force of law; or (3) that the plaintiff's injuries were caused by an act of a person with final policy-making authority. *Guzman* v. *Sheahan*, 495 F.3d 852, 859 (7th Cir. 2007) (internal citation omitted). DelGadillo argues both that there was a widespread practice of tolerating discrimination and harassment and that Gregory, a person with final policy-making authority, is responsible for her injuries. (Dkt. 163 at 29.) The court considers DelGadillo's assertion that Gregory is responsible for her injuries first.

### A.    Act by a Person with Final Policy-Making Authority

DelGadillo contends that because Gregory failed to discipline the firefighters who were harassing her, *Monell* liability should apply. (*Id.* at 38.) But just because Gregory is the *decision maker* with respect to discipline issues inside the Fire Department does not necessarily make him the *policy maker* on those issues. *See Valentino* v. *Vill. of S. Chi. Heights*, 575 F.3d 664, 675–76

(7th Cir. 2009).  For liability to attach Gregory must be responsible for establishing final government policy on those issues.  *See id.* (citing *Pembaur* v. *City of Cincinnati*, 475 U.S. 469, 480–81, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)).  Whether a person has policy-making authority is a question of state law to be decided by the court.  *Id.* (citing *Pembaur*, 475 U.S. at 482–83).

Defendants argue that the Board of Trustees, not Gregory, is the final policy maker because the Board sets personnel policy, whereas Gregory merely has discretion to carry out this policy.  (Dkt. 138 at 34.)  In response, DelGadillo cites a town ordinance, which states that supervisors of departments will have the power to appoint, discipline, suspend, and remove any employee.  (Dkt. 163 at 38.)  But it is a "well-established principle that the mere unreviewed discretion to make hiring and firing decisions does not amount to policymaking authority.  There must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire."  *Valentino*, 575 F.3d at 676–77 (internal citations omitted). DelGadillo offers no other evidence that the Town had a discriminatory policy.  (Dkt. 163 at 38–39.)  Thus, she has failed to produce evidence showing that there is a genuine dispute of material fact as to whether Gregory is a final policy maker.

### B.  Widespread Policy or Practice

DelGadillo also alleges that the Town had a widespread policy or practice of tolerating discrimination and harassment.  "The usual way in which an unconstitutional policy is inferred, in the absence of direct evidence, is by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on," and "by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers."  *Jackson* v. *Marion Cnty.*, 66 F.3d 151,

152 (7th Cir. 1995). The Seventh Circuit has recognized that typical evidence of a widespread practice—evidence that focuses on the application of a policy to different individuals—is not always available. *Phelan* v. *Cook Cnty.*, 463 F.3d 773, 789–90 (7th Cir. 2006). Indeed, in some situations there may not be other individuals within the plaintiff's protected class for a policy to be applied to. *See id.* (observing that "[t]he record reflects that there were almost no women working in a similar capacity to [plaintiff] or in her department"). Still, courts take the word "widespread" seriously: "The plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Id.* at 790.

Defendants argue that DelGadillo cannot produce any evidence of a widespread policy or practice of tolerating discrimination and harassment, as the record shows that once the Town learned of DelGadillo's complaints, it "initiated an investigation, implemented corrective action, and employed all remedial measures available." (Dkt. 138 at 31.) In response, DelGadillo notes that Klosak waited three weeks before conducting official interviews. (Pl. L.R. 56.1 ¶ 63.) She also maintains that the interviews were designed to intimidate her and make her feel as though she, and "not her harassers," were under investigation. (*Id.* ¶ 65.) Indeed, they included a commander with the Police Department. (*Id.*) DelGadillo also argues that the investigation was ineffective. She first voiced her concerns in February; although a training session was held in May, Kolin and Steinhagen were not transferred until October—after DelGadillo had a nervous breakdown. (*See id.* ¶¶ 58–59, 77–78; dkt. 139-24 at 2.)

DelGadillo also maintains that a majority of the harassment she suffered was at the hands of her supervisors, Steinhagen and Kolin, which she argues supports the conclusion "that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *See*

*Phelan*, 463 F.3d at 790. DelGadillo further argues that Gregory was aware of the harassment. According to DelGadillo, when she complained to Gregory he told her to "shut up" and accept the harassment as part of the job. (Pl. L.R. 56.1 ¶¶ 13–14, 16.) He even told her he did not want to hear any more complaints. (*Id.* ¶ 56.) Thus, DelGadillo contends, by "failing to do anything," Gregory "encouraged or at least condoned, thus in either event adopting, the misconduct of subordinate officers." *See Jackson*, 66 F.3d at 152. In light of this evidence, a reasonable jury could find that there was a "widespread policy . . . so permanent and well-settled as to constitute a 'custom or usage' with the force of law." *See Guzman*, 495 F.3d at 859. DelGadillo has shown that there is a genuine dispute of material fact as to whether there was a widespread policy or practice of tolerating discrimination and harassment for the purposes of *Monell* liability.[11]

## II.    Intentional Race Discrimination[12]

DelGadillo states two claims for intentional race discrimination—one under the Equal Protection Clause and one under § 1981. Because these claims are subject to the same standard, the court will consider them together. *See Davis* v. *Wisconsin Dep't of Corr.*, 445 F.3d 971, 976 (7th Cir. 2006) (citing *Hildebrandt* v. *Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1036 (7th Cir. 2003)) (stating that claims for intentional discrimination brought under the Equal Protection Clause are evaluated under the same standard as claims for intentional discrimination brought under Title VII); *see also McGowan* v. *Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009) (noting

---

[11] DelGadillo also argues for *Monell* liability based on inadequate training and supervision. (Dkt. 163 at 36–37.) Because the court has held that a reasonable jury could find that the Town had a widespread practice of tolerating discrimination and harassment, the court will not consider this additional (and similar) argument for liability.

[12] As noted above, because DelGadillo alleges these claims against all defendants, she must establish each defendant's liability. Defendants, however, do not advance any arguments specific to each defendant. Thus, the court does not consider whether DelGadillo has met this requirement.

that the method of proving intentional race discrimination under § 1981 and Title VII is "essentially identical"*).*

A claim for intentional racial discrimination can survive summary judgment if the plaintiff presents either direct or circumstantial evidence of discrimination (the "direct method") or indirect evidence that satisfies the three-part burden-shifting test outlined in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) ("the indirect method"). *Phelan*, 463 F.3d at 779. Whether the plaintiff proceeds by the direct or indirect method, she must show a materially adverse employment action. *Rhodes* v. *Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004).

## A.      Materially Adverse Employment Action

A materially adverse employment action is something "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady* v. *Liberty Nat'l Bank and Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir. 1993). It is a significant change in the plaintiff's employment status such as a discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or transfer of duties. *See Bell* v. *EPA*, 232 F.3d 546, 555 (7th Cir. 2000) (citing *Burlington Indus.* v. *Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)). "[U]nbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge" may also be an adverse employment action. *Barton* v. *Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011). The purpose behind the requirement of proof of an adverse action "is simply that a statute that forbids *employment* discrimination is not intended to reach every bigoted act or gesture" that an employee may experience. *Hunt* v. *City of Markham, Ill.*, 219 F.3d 649, 653 (7th Cir. 2000) (emphasis in original).

Defendants argue that DelGadillo has not shown that she was subjected to a materially adverse employment action. In response, DelGadillo states that this case is "not about a tangible adverse employment action" (dkt. 163 at 1), even though an adverse employment action is critical to her intentional discrimination claims. DelGadillo offers no further argument as to a possible adverse employment action, nor does she address the direct and indirect methods of proof. Thus, defendants need only meet their initial burden of showing there is no genuine dispute of material fact.

DelGadillo's complaint states that she was "demoted in title from Assistant to the Fire Marshal to simply 'administrative assistant.'" (Compl. ¶ 25.) She supports this assertion with deposition testimony, which she references in her response to defendants' statement of facts. (Dkt. 161 ("Pl. L.R. 56.1 Resp.") ¶ 1.) Defendants argue this is insufficient. Although the Seventh Circuit has held that "a less distinguished title" can constitute an adverse employment action, *Hottenroth* v. *Vill. of Slinger*, 388 F.3d 1015, 1029 (7th Cir. 2004) (citing *Crady*, 993 F.2d at 136), it has also held, with considerably more analysis, that "[a]n employee has not suffered an adverse employment action if her title changes but her position remains the same in terms of responsibilities, salary, benefits and opportunities for promotion." *Maclin* v. *SBC Ameritech*, 520 F.3d 781, 789 (7th Cir. 2008) (citing *Grayson* v. *City of Chi.*, 317 F.3d 745, 750 (7th Cir. 2003)). Indeed, the *Maclin* court concluded that "[e]ven a change in title that deprives an employee of prestige is insufficient if it lacks more substantive change." *Id.* at 789 (citing *Grayson*, 317 F.3d at 750). Reading these cases together, DelGadillo must show that, in addition to her demotion in title, she experienced a substantive change in her pay or responsibilities.

Because the parties agree that DelGadillo never received a reduction in pay (Def. L.R. 56.1 ¶ 1; Pl. L.R. 56.1. Resp. ¶ 1), she can only establish a materially adverse employment action

through evidence of a substantive change in her responsibilities. DelGadillo argues that many of

her responsibilities were given to Piekarski, the retired Fire Deputy who came back to the Fire

Department to work as a civilian assistant.[13] (Compl. ¶ 26.) Defendants acknowledge that some

of DelGadillo's duties were given to Piekarski but insist that this does not constitute a

substantive change. For example, Piekarski was charged with overseeing the electronic entry of

Fire Department reports. (Def. L.R. 56.1 ¶ 16.) Defendants argue that Piekarski had to take on

this duty because no one else at headquarters knew how to use the system. (*Id.*) But

DelGadillo's deposition suggests otherwise: DelGadillo testified that Piekarski physically took

her monitor from her desk and refused to train her in the new system. (Dkt. 139-5 at 66:11–

67:21.) Given that DelGadillo alleges that one of her duties was the filling out and filing of

reports, this appears to be a substantive change in her responsibilities. (*See* Pl. L.R. 56.1 ¶ 4.)

The parties also agree that many of DelGadillo's responsibilities were given to Piekarski's wife,

Olivia. (Def. L.R. 56.1 ¶ 18.) Defendants offer no arguments as to these responsibilities other

than to note that Olivia is a Hispanic woman. (*See* dkt. 138 at 5.)

Viewing the facts in the light most favorable to DelGadillo and drawing every reasonable

inference in her favor, the court finds that defendants have not shown that there is no genuine

dispute of material fact as to whether DelGadillo was subjected to an adverse employment

action. Indeed, the parties agree that her responsibilities were transferred to both Piekarskis.

And according to DelGadillo, this transfer happened in addition to her demotion in title.

Although defendants argue that the responsibilities that were given to the Piekarskis were

---

[13] DelGadillo admits, however, that certain responsibilities were given to Piekarski at the
direction of Jerry Chalda—the Fire Marshal who preceded Gregory (and the alleged discrimination and
harassment). (*See* Pl. L.R. 56.1 Resp. ¶ 26.) The court does not consider these responsibilities in its
analysis.

"clerical," and thus did not "realistically enhance[]" DelGadillo's employment status, DelGadillo was, in defendants' words, a *clerk*; the transfer of clerical duties is important.

## B.    Direct Method

A plaintiff must connect the materially adverse employment action to a discriminatory animus, either through the direct method or the indirect method.  While the typical direct method is an admission of discriminatory animus by the employer, a plaintiff can also prevail under the direct method "by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker."  *Rhodes*, 359 F.3d at 504 (internal citation and quotation marks omitted).

As stated above, DelGadillo offers no arguments in support of her claims for intentional discrimination.  Thus, defendants need only show that there is no genuine issue of material fact that would allow "a jury to infer intentional discrimination by the decisionmaker."  *See id.* (internal citation and quotation marks omitted).  Defendants argue that while it was Gregory who allegedly made racially discriminatory remarks, it was Michael Piekarski who took over DelGadillo's duties "based on Piekarski's determination that it was best" (dkt. 138 at 9), thus there is no connection between a discriminatory animus and the adverse employment action. DelGadillo disputes this, noting that she testified that "George Gregory took away her duties." (Pl. L.R. 56.1 Resp. ¶ 24.)  Admittedly, the testimony is unclear:  when asked "who changed the duties for you," DelGadillo responds "George Gregory, like I said, he was the main fire marshal, but he was always being told what to do by -- by Piekarski."  (Dkt. 139-5 at 61:15–20.)  Still, the testimony does not establish that there is no genuine dispute that "it was Piekarski who decided and determined certain duties should be removed."  (*See* Def. L.R. 5.6.1 ¶ 24.)  A permissible inference is that the two men were acting together out of discriminatory animus, as both had

made racist comments to DelGadillo, including Piekarski's question about whether "all Mexicans are stupid" and Gregory's use of the term "wetback." (*See* Pl. L.R. 56.1 ¶ 15; dkt. 139-17 at 329:10–22.)

Thus, the court finds that defendants have not met their burden.[14] Indeed, defendants' arguments and evidence actually suggest a genuine issue of material fact exists. Because defendants have not shown that DelGadillo is unable to prove intentional discrimination through the direct method of proof, the court will not consider defendants' arguments as to whether DelGadillo can prove intentional discrimination through the indirect method of proof.

## III. Intentional Gender Discrimination

DelGadillo also claims intentional discrimination based on gender in violation of the Equal Protection Clause under § 1983. Claims for intentional discrimination are evaluated under the same standard when brought under the Equal Protection Clause as they are when brought under Title VII. *Davis*, 445 F.3d at 976 (citing *Hildebrandt*, 347 F.3d at 1036). But because defendants do not advance any arguments independent of their arguments against DelGadillo's intentional race discrimination claims, the court declines to grant summary judgment on this claim.

## IV. Sexual and Racial Harassment

Because the Constitution prohibits *intentional* discrimination by state actors, § 1983 relief is available to a plaintiff claiming a hostile work environment only if she can also demonstrate that the defendant acted with discriminatory intent. *Huff* v. *Sheahan*, 493 F.3d 893, 902 (7th Cir.

---

[14] Defendants also argue that "the two year statute of limitations bars the discrimination claim," because "[a]ny adverse action allegedly occurred in 2007" and DelGadillo filed suit in 2011. (Dkt. 138 at 7.) Although 2007 is the earliest that the adverse employment action could have occurred, defendants do not cite to any evidence that suggests it is also the latest. Thus, the court declines to grant summary judgment on this basis.

2007); *Valentine*, 452 F.3d at 683. Thus, DelGadillo must show both (1) sexual and/or racial harassment and (2) intent to harass her based on her membership in a protected class. *Trautvetter* v. *Quick*, 916 F.2d 1140, 1149 (7th Cir. 1990); *Bohen* v. *City of East Chi., Ind.*, 799 F.2d 1180, 1187 (7th Cir. 1986).

The inquiry under the harassment prong mirrors that used to evaluate a Title VII hostile work environment: the plaintiff must show that the harassment was sufficiently severe or pervasive as to alter the conditions of her employment and create an abusive working environment. *Trautvetter*, 916 F.2d at 1149 (internal citations omitted). The plaintiff must also show that the conduct was unwelcome. *Id.* Under the second prong, a plaintiff must prove the defendant's harassment resulted from an intent to discriminate against her because of her gender. *Id.* at 1151; *Bohen*, 799 F.2d at 1187. In making this showing, the plaintiff need not show that all or multiple women were sexually harassed; "discrimination against the plaintiff because of her membership in the class is by itself enough." *Bohen*, 799 F.2d at 1187.

### A. Harassment

"Harassment is not limited to acts of sexual desire, but rather is a broad term which encompasses all forms of conduct that unreasonably interfere with an individual's work performance or create an intimidating, hostile, or offensive working environment." *Haugerud* v. *Amery Sch. Dist.*, 259 F.3d 678, 692 (7th Cir. 2001) (internal quotation marks and citations omitted). Yet, "not all workplace conduct that may be described as 'harassment' affects a term, condition, or privilege of employment within the meaning of Title VII." *Adusumilli* v. *City of Chi.*, 164 F.3d 353, 361 (7th Cir. 1998) (internal quotation marks and citations omitted). Thus, to prevail on a hostile work environment claim, a plaintiff "must show that the work environment was both subjectively and objectively hostile." *Haugerud*, 259 F.3d at 692–93. "An objectively

hostile environment is one that a reasonable person would find hostile or abusive," and a court

"must consider all the circumstances, including the frequency of the discriminatory conduct; its

severity; whether it was physically threatening or humiliating; or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance." *Adusumilli*, 164 F.3d

at 361 (internal quotation marks and citations omitted). The court will consider DelGadillo's

claims against the individuals—Kolin, Steinhagan, and Gregory—before considering her claim

against the Town.[15]

### 1.      Kolin

Defendants argue that Kolin's behavior does not constitute severe and pervasive

harassment, as he simply asked DelGadillo to wear tight jeans, to go on a dinner date with him,

and, after giving her Popeye's chicken, said, "What else is after dinner? Maybe sex?" (Dkt. 138

at 18.) DelGadillo, however, tells a different story. According to DelGadillo, Kolin frequently

made sexual remarks to her, including, on more than one occasion, that she needed a "stiff man

and a stiff drink." (Pl. L.R. 56.1 ¶ 28.) On another occasion, after telling her that her lipstick

looked good, Kolin said, "I wish it was on me." (*Id.* ¶ 29.) In addition to asking DelGadillo to

wear tight jeans, Kolin told her to grow her hair long because he was attracted to women with

long hair. (*Id.*) After a workplace presentation on abandoned infants, Kolin told DelGadillo that

all women are good for is "making babies." (*Id.*)

According to DelGadillo, Kolin also propositioned her on several occasions—asking her

to get dinner and drinks and asking her to "meet him upstairs" in the firehouse that was attached

to headquarters. (*Id.* ¶ 32.) When DelGadillo rebuffed his advances, Kolin told her that she

---

[15] As a preliminary matter, defendants argue that DelGadillo's evidence is flawed because it is self-contradictory and uncorroborated. (*Id.* at 16.) The court, however, may not weigh conflicting evidence or make credibility determinations at summary judgment. *Omnicare, Inc.*, 629 F.3d at 704. The court may only make determinations of genuine issues of material fact.

must be in a bad mood because she was menstruating.  (*Id.* ¶ 33.)  He also started preventing her from taking full lunch breaks in retaliation.  (*Id.*)  When DelGadillo told Kolin she was entitled to take full lunch breaks, Kolin threatened to take away her lunch breaks completely, yelled, "Who the fuck do you think you are?" and started taking off his belt.  (*Id.* ¶ 34.)  DelGadillo states that Kolin also made racist remarks to her, including "make some of your Mexican rice. That's all you're good for."  (*Id.* ¶ 31.)  Kolin also threatened DelGadillo when she went to Internal Affairs, telling her not to be a rat because rats get killed.  (*Id.* ¶ 74.)

DelGadillo has demonstrated a genuine dispute of material fact as to whether Kolin's actions created an objectively hostile work environment.  *See Haugerud*, 259 F.3d at 692. Taking her assertions as true, Kolin's behavior was both physically threatening (e.g., his taking off his belt) and humiliating (e.g., commenting that DelGadillo needed a "stiff man and a stiff drink").  *See Adusumilli*, 164 F.3d at 361.  Although some of Kolin's comments, when viewed individually, may appear to be nothing more than offensive utterances—such as his comment that all women are good for is "making babies"—taken together they could be viewed as creating an atmosphere so hostile it interfered with DelGadillo's work performance.

### 2. Steinhagan

Defendants also argue that DelGadillo has not produced any evidence that Steinhagan harassed her.  (*See* dkt. 138 at 21.)  According to DelGadillo, however, Steinhagan told her degrading jokes about women and referred to Hispanic women as whores.  (Pl. L.R. 56.1 ¶ 42.) He frequently left pornographic and lingerie magazines on her desk and, on more than once occasion, showed her pictures of "provocative lingerie" and told her that it would look nice on her.  (*Id.* ¶¶ 39–40.)  He also told her she should have more sex because it would help her skin clear up.  (*Id.* ¶ 43.)

Steinhagen frequently sat in DelGadillo's chair before she arrived at work, which he did, according to DelGadillo, so that he could touch her when they passed in the narrow corridor behind her desk. (*Id.* ¶ 51.) Whenever she got up to use the bathroom, Steinhagen would make a point to stand in the hallway and brush up against her and grope her when she returned. (*Id.* ¶ 50.) DelGadillo asserts that when she got up from her chair, Steinhagen would say "oh, you must be on your period today because it smells like fish." (*Id.* ¶ 38.) Steinhagen made other regular unwanted contact with Delgadillo, rubbing up against her and grabbing her upper thigh. (*Id.* ¶ 48.) He would also find excuses to touch her, like saying he was taking pieces of lint off her thigh and back. (*Id.* ¶ 49.) Once, Steinhagen forcibly kissed her on the lips. (*Id.* ¶ 47.)

Taken as a whole, this behavior—which includes verbal harassment, frequent and degrading physical touching, and humiliating comments—could be viewed as creating a hostile work environment. *See Adusumilli*, 164 F.3d at 361. Although defendants note that Steinhagen denies making any harassing comments to DelGadillo and insists he only touched her "inadvertently" (dkt. 138 at 18–19), denials do not warrant summary judgment; rather, they suggest a genuine dispute of material fact.

### 3. Gregory

Although DelGadillo does not accuse Gregory of sexual harassment, she does accuse him of racial harassment. According to DelGadillo, Gregory used racial slurs—including the word "nigger." (Pl. L.R. 56.1 ¶ 25.) He also referred to Hispanics as "your people" when addressing DelGadillo. (*Id.*) On one occasion, after Gregory returned from vacation, DelGadillo made a remark about his tan. (*Id.* ¶ 26.) He responded "yeah, us white people tan red and you people get black almost like a nigger." (*Id.*) According to DelGadillo, he also condoned racial slurs in her presence. (*Id.* ¶ 24.)

Gregory's comments, although certainly offensive, did not create a hostile work environment. As noted above, when considering whether a work environment is hostile, a court "must consider all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Adusumilli*, 164 F.3d at 361 (internal quotation marks and citations omitted). Gregory's comments were infrequent; DelGadillo alleges that Gregory condoned slurs only once, and used them himself no more than a handful of times (he may have used them less, it is unclear from DelGadillo's statement of facts). His use of slurs, though offensive, was not severe and pervasive.

In addition, DelGadillo argues that Gregory should be held liable for condoning the sexual and racial harassment. (Dkt. 163 at 27); *see also Yang* v. *Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (noting that "under certain circumstances a state actor's failure to intervene renders him or her culpable under § 1983"). This theory of liability is typically applied to police officers' failure to help private citizens, not firefighters' failure to help fellow employees. *See, e.g.*, *Sanchez* v. *City of Chi.*, 700 F.3d 919, 928 (7th Cir. 2012) (discussing a claim for failure to intervene based on a police officer's use of excessive force). Even when courts have extended this theory to firefighters, they have limited it to firefighters' interactions with private citizens. *See Ali* v. *Vill. of Tinley Park*, No. 14 C 4053, 2015 WL 160331, at **1, 5 (N.D. Ill. Jan. 7, 2015) (denying motion to dismiss failure-to-intervene claim where firefighters observed another firefighter spray an African-American Muslim man with a fire hose and "did nothing to stop him"). Because this theory of liability does not apply in this context, the court enters summary judgment in Gregory's favor with respect to DelGadillo's hostile work environment claim.

### 4. The Town of Cicero

As stated above, there is a genuine dispute of material fact as to whether the Town can be held liable under *Monell*. (*See supra* Part I.) There is also a genuine dispute of material fact as to whether Kolin and Steinhagan's behavior constituted a hostile work environment in violation of the Equal Protection Clause. This, however, does not necessarily mean that there is a genuine dispute of material fact as to whether the Town's widespread practice was responsible for the alleged hostile work environment.

The premise behind a § 1983 action against a government body is that the body's policy or practice is *responsible* for the deprivation of rights. *Thomas* v. *Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 306 (7th Cir. 2010) (citing *Monell*, 436 U.S. at 690). Thus, in order to establish liability against the Town for the alleged hostile work environment, DelGadillo will have to show that the widespread policy described above is responsible for the environment—in other words, she will have to demonstrate a causal connection. Defendants do not address this requirement, nor do they offer any arguments as to the Town's liability for the hostile work environment. Thus, defendants have not met their burden and the court declines to grant summary judgment against the Town.

### B. Intent

Because DelGadillo's harassment claims are brought pursuant to § 1983, she must also show a discriminatory intent. *Huff*, 493 F.3d at 902; *see also Valentine*, 452 F.3d at 683. Defendants do not address this requirement other than to state that DelGadillo has not offered enough evidence to demonstrate that the harassment was because of her status as a Hispanic woman. (Dkt. 138 at 21.) This statement alone is insufficient, especially given the nature of the harassment DelGadillo alleges. Indeed, viewing the facts in the light most favorable to

DelGadillo, the harassment she experienced was motivated by her status as a Hispanic woman. For example, Kolin told DelGadillo that she needed a "stiff man and a stiff drink" and that all women are good for is "making babies." (Pl. L.R. 56.1 ¶¶ 28, 30.) He also suggested her lack of interest in him was because she was menstruating. (*Id.* ¶ 33.) These comments are based on DelGadillo's status as a woman. Similarly, Steinhagan's comments about Hispanic women being "whores" are based on her ethnicity. (*See id.* ¶ 42.) With nothing more than a blanket statement that DelGadillo has not produced enough evidence, defendants have failed to establish that there is no genuine dispute of material fact as to defendants' intent to discriminate.

Thus, the court denies summary judgment with respect to DelGadillo's harassment claims against Kolin, Steinhagan, and the Town and grants summary judgment with respect to DelGadillo's harassment claims against Gregory.

## V.     Conspiracy to Interfere with Civil Rights

DelGadillo also alleges conspiracy under 42 U.S.C. § 1985. "The function of § 1985(3) is to permit recovery from a private actor who has conspired with state actors." *Fairley* v. *Andrews*, 578 F.3d 518, 526 (7th Cir. 2009) (citing *Dennis* v. *Sparks*, 449 U.S. 24, 101 S. Ct. 183, 66 L. Ed. 2d 185 (1980); *Adickes* v. *S.H. Kress & Co.*, 398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970)). Where defendants are all state actors, "a § 1985(3) claim does not add anything except needless complexity." *Id.* Other courts in this Circuit have found § 1985(3) claims against state actors superfluous. *See Kremer* v. *City of Decatur*, No. 11-2258, 2014 WL 3952906, at *1 n.2 (C.D. Ill. Aug. 13, 2014) (stating that where plaintiff sued the City of Decatur, its police chief, and two police officers, plaintiff's conspiracy claim was "superfluous in light of the fact that all named defendants are state actors" (internal quotation marks omitted)); *Whitehorn* v. *Lawson*, No. 09 C 6100, 2012 WL 567574, at *5 n.5 (N.D. Ill. Feb. 21, 2012)

(granting summary judgment in favor of defendants on plaintiff's § 1985 claim against the City

of Chicago and Chicago police officers because the defendants were all "state actors"). Thus,

the court grants summary judgment as to all defendants on DelGadillo's claim under § 1985.[16]

## VI. Intentional Infliction of Emotional Distress

Finally, DelGadillo alleges intentional infliction of emotional distress ("IIED") against

the individual defendants.[17]  To establish an IIED claim under Illinois law, DelGadillo must

show that "(1) the defendants' conduct was extreme and outrageous; (2) the defendants knew

that there was a high probability that their conduct would cause severe emotional distress; and

(3) the conduct in fact caused severe emotional distress."  *Swearnigen-El* v. *Cook Cnty. Sheriff's*

*Dep't*, 602 F.3d 852, 863–64 (7th Cir. 2010) (citing *Kolegas* v. *Heftel Broad. Corp.*, 607 N.E.2d

201, 211, 154 Ill. 2d 1, 180 Ill. Dec. 307 (1992)).  "To meet the 'extreme and outrageous'

standard, the defendants' conduct 'must be so extreme as to go beyond all possible bounds of

decency, and to be regarded as intolerable in a civilized community.'"  *Id.* at 864 (citing *Kolegas*,

607 N.E.2d at 211).

Defendants argue that Kolin, Steinhagan, and Gregory's behavior amounted to nothing

more than "insults, indignities, and annoyances at worst."  (Dkt. 138 at 38.)  The court agrees

with defendants as to Gregory only.  DelGadillo does not allege that Gregory sexually harassed

her, only that he occasionally made racists comments to her.  (Pl. L.R. 56.1 ¶¶ 25–26.)  While

---

[16] Plaintiff's claim may also be barred by the intracorporate-immunity doctrine.  The doctrine provides that "managers of a corporation jointly pursuing its lawful business do not become 'conspirators' when acts within the scope of their employment are said to be discriminatory."  *Travis* v. *Gary Cmty. Health Ctr., Inc.*, 921 F.2d 108, 110 (7th Cir. 1990).  It applies with full force to government entities like the Town.  *See Wright* v. *Ill. Dep't of Children & Family Servs.*, 40 F.3d 1492, 1508–09 (7th Cir. 1994); *Allen* v. *City of Chi.*, 828 F.Supp. 543, 564 (N.D. Ill. 1993).

[17] Defendants ask the court to "dismiss" plaintiff's IIED claim against the Town because plaintiff "failed to plead *respondeat superior* liability for her state law claim against the Town."  (Dkt. 138 at 37.) It is clear from plaintiff's complaint, however, that her IIED claim is only against the individual defendants.  (Compl. at 24 (alleging IIED "against all individual defendants").)

these comments were inappropriate and insensitive, they do not rise to the level of extreme and outrageous conduct.

Kolin and Steinhagen, however, are different. Kolin's repeated verbal harassment of DelGadillo—including when he yelled "Who the fuck do you think you are" and took off his belt, prompting DelGadillo to run away—could reasonably be viewed as extreme and outrageous conduct. (*See id.* ¶¶ 29–34.) Kolin also threatened DelGadillo after she reported the harassment to Internal Affairs: according to DelGadillo, Kolin told her not to be a rat and then said, "you know what happens to rats, they drown and die." (*Id.* ¶ 84.) Given Kolin's previous behavior, and his status as DelGadillo's supervisor, it is unlikely that she interpreted this comment as an idle threat.

The same is true of Steinhagen's behavior. In addition to degrading comments, Steinhagen repeatedly touched DelGadillo, including forcing her to pass him through the narrow corridor behind her desk and on her way to the bathroom. (*Id.* ¶¶ 50–51.) Steinhagen made other regular unwanted contact with her—grabbing her upper thigh, pressing and rubbing his body up against her, groping her, and forcibly kissing her. (*Id.* ¶¶ 47–49.) DelGadillo also asserts that it was Steinhagen whose outburst caused her panic attack. In response to DelGadillo's suggestion, Steinhagen said, "You don't tell me what to do. I tell you what to do. Who the hell do you think you are? . . . wait until I get back there. I'm going to get you." (*Id.* ¶ 88.) DelGadillo testified that she thought he was going to beat, rape, or kill her. (*Id.*) This evidence is enough to raise a genuine dispute of material fact as to whether Kolin and Steinhagen have engaged in extreme and outrageous conduct. Indeed, DelGadillo states that, as a result of defendants' behavior, she has experienced sleeplessness, nausea, breakouts, and thinning hair.

(*Id.* ¶ 96.) Two different medical professionals have diagnosed her with severe depression and post-traumatic stress disorder. (*Id.* ¶¶ 97–98.)

Although Illinois courts are reluctant to find IIED in the employment context, this reluctance is grounded in a fear that, if the anxiety and stress resulting from discipline, transfers, or even terminations could form the basis of an action for emotional distress, "virtually every employee would have a cause of action." *Welsh* v. *Commonwealth Edison Co.*, 713 N.E.2d 679, 684, 306 Ill. App. 3d 148, 239 Ill. Dec. 148 (1999). DelGadillo does not allege IIED because of an ordinary employment action, however, but because she was subjected to constant discrimination and harassment. Although somewhat duplicative of her harassment claims, the court denies summary judgment on DelGadillo's claims against Kolin and Steinhagan. Summary judgment is granted in favor of Gregory.[18]

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment on plaintiff's intentional discrimination claim in violation of the Equal Protection Clause and defendants' motion for summary judgment on plaintiff's intentional discrimination claim in violation of § 1981 are denied as to all defendants. Defendants' motion for summary judgment on plaintiff's hostile work environment claims under the Equal Protection Clause is granted as to Gregory but denied as to Kolin, Steinhagan, and the Town. Defendants' motion for summary judgment on plaintiff's § 1985 claim is granted. Finally, defendants' motion for summary judgment on plaintiff's claim for intentional infliction of emotional distress is granted as to Gregory but denied as to Kolin and Steinhagan. Defendants' motion to strike is denied as moot.

---

[18] Defendants also argue that DelGadillo has failed to show a causal connection between their conduct and her distress, as she, allegedly, is also the victim of parental and spousal abuse. (Dkt. 138 at 39–40.) The existence of other abuse, however, does not preclude recovery. There is sufficient evidence from which a jury could infer cause and effect related to the defendants.

The following counts remain:  (1) race, national origin, and gender discrimination in violation of the Equal Protection Clause against all defendants; (2) race and national origin discrimination in violation of § 1981 against all defendants; (3) hostile work environment based on sexual and racial harassment in violation of the Equal Protection Clause against Kolin, Steinhagan, and the Town; and (4) intentional infliction of emotional distress against Kolin and Steinhagan.   A status hearing is set for April 21, 2015 at 11:00 a.m.

Date:   March 27, 2015